UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NO.: 11-cv-60020-WJZ

S & S DIESEL MARINE SERVICES, INC.,

    Plaintiff/Counter-Defendant,

v.

M/V "F-TROOP" that certain 1991, 53 foot Viking
Motor Vessel, bearing Hull Identification Number
VKY53135B191, including her engines, tackle,
apparel, and appurtenances, *in rem*; and, PAUL
FLEISCHER, *in personam*,

    Defendants/Counter-Plaintiff.
_____/

**CLAIMANT/OWNER'S MEMORANDUM OF LAW IN SUPPORT OF
VACATING THE *F-TROOP'S* ARREST OR, IN THE ALTERNATIVE,
<u>SETTING A NOMINAL BOND AMOUNT</u>**

COMES NOW, Claimant/Owner, Paul Fleisher ("Fleisher"), by and through his undersigned counsel, and files this Memorandum of Law as permitted by Magistrate Judge Rosenbaum [DE 36] and shows:

**BACKGROUND**

1.    Claimant/Owner Fleisher filed a Motion for Post-Arrest Show Cause Hearing pursuant to Supplemental Admiralty Rule E(4)(f), E(5) and Local Admiralty Rule 3(g) [DE 29]. By Order of Referral [DE 30] the district court referred the motion [DE 29] to Magistrate Judge Rosenbaum for determination. The Magistrate Judge granted the request for a post-arrest hearing and conducted a hearing on May 5, 2011. [DE 31]. This memorandum of law supports why the arrest should be vacated or, in the alternative, why pursuant to Supplemental Admiralty Rule

E(5) a special release bond in a nominal amount substantially lower than requested by Plaintiff should be set at $1.00.

## THE LAW AS IT APPLIES TO THE EVIDENCE OF THIS CASE

2.   Supplemental Rule E(4)(f) provides, in pertinent part, that: "...the Plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."  The two contracts introduced into evidence at the May 5, 2011 hearing by Plaintiff S & S Diesel Marine Services, Inc. ("S & S") contain identical payment terms.  Both contracts are for rebuilding the engines of *F-Troop*.  On seven out of the total nine contract pages, in the upper right-hard corner, it states "TERMS: 50% down, 50% on completion."  See Exhibits "A" and "B" attached hereto.

3.   S & S drafted the engine rebuilding contracts and decided to make the payment terms "50% down, 50% on completion."  S & S is a sophisticated party who was, or should have been, well aware of the payment terms it put in the contract presented to the Claimant/Owner for signature prior to stopping work on the vessel or arresting it.  S & S could have put different payment terms in the contracts but chose not to.  Now S & S wants to re-write the contract payment terms without having completed all of the contracted work or demonstrating that the engines perform to the manufacturer's specifications.

4.   Fleisher insisted upon adhering to the original contractual terms and would not agree to re-write the payment terms. In particular, Fleisher demanded S & S conduct a sea trial for purposes of testing and/or inspecting S & S's work because: (a) S & S's subcontractor destroyed a crankshaft, which S & S made Fleisher pay to replace; (b) S & S's failure to install the proper internal parts in one of the engines, which resulted in dangerously low oil pressure; and (c) the conclusions reached by Fleisher's experts that S & S was responsible for the 2009

engine failure that was now being rebuilt for the second time by S & S in 2010.

5.      Instead of addressing Fleisher's reasonable concerns about engine performance and completion of the contracted for job, S & S arrested the vessel for alleged failure to pay the contract balance even though it was **not yet due** under the contract.

6.      In admiralty and maritime proceedings, the case law is clear:

> "The traditional rule of construction in admiralty cases is to 'construe the contract language most strongly against the drafter.' " *Misener Marine Construction, Inc. v. Norfolk Dredging Company*, 594 F.3d 832; 2010 U.S.App. Lexis 1316; 2010 AMC 250; footnote 15 at 839, cert. denied, 2010 U.S. Lexis 5496 (U.S., June 28, 2010) (internal citations omitted).

7.      By simply looking at the payment terms required by the two contracts under which S & S arrested the *F-Troop* it becomes unquestionably clear this was a wrongful arrest because the job was not completed. Therefore, the remaining balance due "50% on completion" was not ripe for adjudication either prior to or after the arrest of the vessel. This contract interpretation is consistent with the traditional rule of contract construction in admiralty cases required by the Eleventh Circuit to construe the contract language "most strongly against the drafter." *Id.*

8.      At the evidentiary hearing, the Court observed first-hand S & S's attempt to re-write the payment terms. S & S ignores a common sense interpretation of the plain language used: "TERMS - 50% down, 50% on completion" to justify its arresting the vessel. For the Court to ignore these clear, unambiguous terms would require the Court to disregard the Eleventh Circuit's admonition that admiralty cases require contracts to be construed in language most strongly against the drafter.

9.      The evidence showed that S & S is owned by Jean Sebastien Brismeur who created the company in 1999. (See transcript of post-arrest show cause evidentiary hearing, page

6, lines 2-23.  Note: all subsequent references to the hearing will be made by page and line.)  Mr. Brismeur wrote the contracts at issue.  (See page 10, line 8 through page 11, line 22).

  10. Fleisher made the deposit payments as required by the contracts.  S & S admitted as much during the evidentiary hearing:

> Q. You were paid no amount?
>
> A. No.  I was given an amount.  **I was given roughly half of what the total bill was.**  (Emphasis added).

Brismeur direct examination, page 17, line 24 through page 18, line 1.

* * *

> Q. Okay.  So he provided the operator.  Where does it say in the paragraph on sea trial what I just heard about, about, you know, you have got to pay X percentage of the bill before you will even sea trial your boat?
> Can you just direct my attention in this contract where it says that a certain amount of money needs to be paid before the owner of a boat can find out whether his two engines have been successfully rebuilt?
>
> A. It is not on this.
>
> Q. Okay.  But is it on one of his other sheets that you have there?
>
> A. Yes.  Actually, it says, "50 percent down."  Then it says, "50 percent upon completion."
>
> Q. Okay.  And where are you looking at?
>
> A. On the service contract.
>
> Q. Okay.  What paragraph?
>
> A. It is the first page.
>
> Q. The first page.  Is it under a heading of sea trial?
>
> A. No.  It says, "Terms.  50 percent down and 50 percent on completion."
>
> Q. But it doesn't say that in relation to sea trial, does it?

> A. It says, "Terms. 50 percent down and 50 percent on completion." What else do you want me to tell you?
>
> Q. And Doctor Fleisher paid you about $102,000 on these two engine rebuilds, and you are basically asking for another eighty something thousand, right?
>
> A. Basically, that's the work that I did. That is what it cost.
>
> Q. Right.
>
> A. That's it.
>
> Q. Right. I understand. So you would agree with me, wouldn't you, that $102,000 is probably more than 50 percent of the job?
>
> A. Yes. Thanks to my good will.
>
> Q. Okay. So he paid more than 50 percent. He went on a sea trial, and it doesn't say anything more about then that he has to pay an additional amount of money to have a sea trial, correct?
>
> A. There is nothing additional. It is what he owes me.

Page 105, line 11 through page 106, line 23.

11. Mr. Brismeur testified the total amount billed for the engine rebuilds was $189,181.71. (See page 18, lines 1-2). Mr. Brismeur further testified that the total balance due and unpaid was $83,032.94. Subtracting the total amount billed from the outstanding amount shows Fleisher met his contractual obligations by paying what was currently owed under the contract prior to S & S's completion of the project.

12. The contracts contain under a section called "Service Contract," a paragraph entitled "Sea Trials." See Exhibits "A" and "B" attached hereto. The Sea Trial clause says in pertinent part:

> "Should a sea trial be necessary for the purpose of testing and/or inspection of work and/or parts furnished by contractor, the owner agrees

to provide a Captain and significant crew for the safe handling of the vessel...."

13. Right underneath the paragraph concerning sea trials is ¶ 5 which is entitled "Payment Terms." The Payment Terms clause says in part: "The owner acknowledges that he has read this document and agrees with the terms and conditions set forth." Five pages of S & S's contract marked Exhibit "A" hereto and three pages of S & S's contract marked Exhibit "B" hereto contain the payment terms of "50% down, 50% on completion." In a statement against interest, S & S admits "**the work is not 100% complete**." (See DE 44, page 4, ¶ 15; Emphasis added). S & S attempts to excuse its non-performance under the contracts by saying Fleisher refuses to pay even though S & S has not completed 100% of the contracted work and has not successfully proven the engines performance to the manufacturer's specifications by a successful sea-trial, which includes normal oil testing results. The attempt to spin the improper arrest into something that is the owner's fault is designed to distract the Court's attention away from S & S's failure to complete the job as required by the contracts. S & S simply cannot excuse its non-performance by blaming Fleisher because Fleisher has fulfilled his contractual payment obligations. In essence, S & S has failed to meet its burden of proof to show it had a reasonable basis for arresting *F-Troop* and to explain to the Court why the arrest should not be vacated.

14. Further, S & S has failed to meet its burden of proof because it has not shown it has provided any "*necessaries*" to the vessel. The term "*necessaries*" means goods or services that are **useful** to the vessel, keep her out of danger, **and enable her to perform her particular function**. *Equilease Corp. v. M/V Sampson*, 793 F.2d 598 (5th Cir.) *cert. denied* 479 U.S. 984, 107 S. Ct. 570 (1986); *S.E.L. Maduro (Florida), Inc. v. M/V Antonio De Gastenata*, 1990 AMC 2097 (S. D. Fla. 1990). S & S's failure to complete its work as required by the contracts, the

failed sea-trail and abnormal oil test result show the engines are not functioning to the manufacturer's specifications and most importantly do not enable *F-Troop* to perform her particular function as a recreational fishing vessel at this point in time until the engines are proven and the job is completed.

### EQUITABLE CONSIDERATIONS REQUIRE THE COURT TO REDUCE THE DEMANDED RELEASE BOND TO $1.00

15. In the event the Court does not vacate the arrest because it has no factual or legal basis, then the Court must look to Supplemental Admiralty Rule E(5)(a) to set a bond in an amount "sufficient to cover the amount of Plaintiff's claim **fairly stated**...." (Emphasis added).

16. In determining the "fairly stated" amount of S & S's claim, the Court may look beyond the four corners of the claim:

> "Where the claim is unliquidated and the parties cannot agree as to the amount of the bond, it will be incumbent upon the Court to make some effort to place a reasonable value on the claim." *Twentieth Century Fox Film Corporation v. M/V Ship Agencies, Inc.*, 992 F. Supp. 1429, 1431 (M.D. Fla. 1997) (citations omitted).

17. Maritime jurisdiction is based on either a maritime contract or a maritime tort. In the present case, S & S alleges entitlement to foreclose a *necessaries* lien based upon the breach of a maritime contract to rebuild engines on the vessel *F-Troop*. The breach alleged is Fleisher's nonpayment of the balance due. A contract for the repair of a vessel creates a maritime lien for *necessaries* provided the work is done correctly and enables the vessel to perform its function. In the case at bar the analysis must start with the underlying contract terms.

18. In the present case, the Claimant/Owner signed a contract for engine rebuilding services which required "50% down and 50% on completion." The Claimant/Owner did his part by paying 50% down and the uncontested testimony shows the job was not completed when the

7

vessel underwent a sea trial more than one year after the job commenced.  Indeed, S & S's admission against interest confirms this sued upon work is still "not 100% complete."  (DE 44, page 4, ¶ 15).  Therefore, based on a weighing of the equities this Court must exercise its discretion to either vacate the arrest or require a nominal bond amount to release the vessel such as $1.00 because the final payment for which the vessel was arrested was not and is not due.  S & S wrongfully arrested the vessel because it breached the terms of the written contract between the parties by demanding payment before completing its work and the sea trail and oil test show its work was not performed in a workmanlike manner.

19. District courts have discretion to determine the appropriate amount of a release bond based upon the value of the Plaintiff's claims.  See, *e.g.*, *Shakit v. M/V Forum Trader*, 1994 AMC 68, 71, 14 F.3d 5, 8 (5th Cir. 1993) (concluding that the district court's "order setting the release bond at $150,000 [despite plaintiffs' 6 million claim] is...an exercise of the district court's discretion to value the plaintiffs' claims").

20. Based on the evidence presented at the hearing, the Court, in its discretion, needs to make a preliminary assessment of the reasonableness of S & S's claimed damages when setting a release bond.  This requires weighing whether the engine repairs were done correctly.  Additionally, it requires the Court to evaluate equitable considerations when reducing the demanded security.  Essentially, the discretion available allows the Court to exercise its judgment to value S & S' claim.

21. As shown above, S & S wrongfully arrested the vessel *F-Troop* for failure to pay for engine rebuilding services which are not complete and the results of which are subject to serious doubt.  The contract written by S & S required that the engine rebuilding be complete before the final 50% payment was due.  The uncontested evidence and admission against interest

shows this contractual condition precedent was not met by S & S.

22. Mr. Brismeur admitted at the hearing that the work was not completed on this vessel.

> "Well, there is always little things that you do here and there. Whether it is clamps and hoses, you know, you just had two engines completely disassembled and you reassemble. There is a lot of parts. There is a lot of parts in the engine room. So there is always things to do. Even after a sea trial, there are little things that need to be done."

Page 54, lines 8-13.

23. Because the engine rebuilding and associated work to put the vessel back together is neither complete nor proven, the final payment of 50% is not currently due and cannot form the basis for determining a release bond because Fleisher is under no contractual obligation to make the final payment.

24. S & S failed to meet its burden to show a reasonable basis to proceed with arresting the vessel under the contract terms which only require the remaining 50% due upon full completion of the job. The job is not complete.

25. The following factors weigh into the equitable considerations to reduce the demanded security in this action. First, the plain language of the contract does not require any payment until the job is complete and the job is neither complete or proven. Mr. Brismeur testified that during the sea trial special instrumentation was hooked up to the engine and the results were recorded. (See page 74, lines 2-10). The results of the engine performance provided by the instruments hooked up to the engines during the sea trial were not given to Dr. Fleisher, the professional engineer he hired to attend the sea trial, Brian Howe, or the expert surveyor also in attendance on Dr. Fleisher's behalf, Matt Schmahl. Without these results there is no proof the engines performed as specified by the manufacturer. (See page 75, line 17 through page 76, line

10). Mr. Brismeur was pointedly asked:

> Q. Were you intending to ever share the results that were recorded during the sea trial?
>
> A. I am still waiting to get paid.
>
> Q. So you have got to get paid before you are going to share the results. Is that what I am hearing you say?
>
> A. I don't need to share any results at this point. We did the sea trial. The engine runs. The boat ran so now I would like to get paid and then we can continue and finish this, but so far I haven't gotten anything.

Page 77, lines 9-17.

26. This, of course, is not entirely correct because Dr. Fleisher paid over $105,000.00 as Mr. Brismeur admitted during the evidentiary hearing and through counsel. (See DE 44, page 4, ¶¶ 16 and 18).

27. This whole situation started when S & S presented invoices to Dr. Fleisher <u>prior</u> to the completion of work contracted for and demanded full payment prior to a sea trial for testing and/or inspection. In Mr. Brismeur's own words:

> "At that point I get paid the remainder of what I am owed. Then I do the sea trial, and then if there is anything that needs to be taken care of after the sea trial, it is taken care of, and then I can deliver him the boat". (Page 17, lines 18-21).

28. Mr. Brismeur explained his understanding of the contract as follows:

> "First of all, you give me a deposit and I should not have to hound Mr. Fleisher to get a deposit because right now I am the one that had to advance money so I get a 50% deposit. Then I get at least 80% at start-up. That's when the engine starts up. Then we do the sea trial, and after the sea trial, I get the remainder, and then the warranty begins if there is any issues. That's how it works. Fleisher doesn't decide how it works". (Page 56, line 25 through page 57, line 8).

29. As set forth in ¶¶ 18 and 19 above, Mr. Brismeur changed his understanding of

10

when payment under the contract was due twice during the hearing. At first, it was full payment and then he would do a sea trial. Next, it was 30% additional at start up and the balance after the sea trial. What about the contract terms he wrote of "50% down, 50% on completion?"

30. S & S did not fairly state its claim because:

    a. It was not due payment because the job was not completed as contracted for;

    b. S & S refused to provide Claimant/Owner the results of the oil analysis it allegedly obtained for the engines after the February 2011 sea-trial to show its work was properly performed and that internal engine functioning was normal;

    c. S & S refused to provide instrument readings and other recorded data from the February 2011 sea-trial to the Claimant/Owner and his representatives to substantiate the engines are performing in accordance with MAN's specifications (i.e. the engine manufacturer's specification);

    d. S & S failed to honor its agreement as testified to by both Brian Howe and Matthew Schmahl to provide engine performance data from Scott Marine Power taken during the February 2011 sea-trial at the conclusion of the sea-trial;

    e. S & S and its expert, Scott Marine Power, refused to allow Claimant/Owner's expert, Brian Howe, to be in the engine room during the February 2011 sea-trial to make first hand

11

    observations of engine performance and data; and,

  f. At the evidentiary hearing, S & S failed to provide a reasonable explanation why the oil samples taken by Claimant/Owner after the February 2011 sea-trial and tested by Motor Check Analysis Clinic showed: "lead level (bearings) high."

  31. The Court heard testimony from Brian Howe and received into evidence his expert report based upon a reasonable degree of engineering certainty that the sea trial showed the engine rebuilds failed to meet accepted performance criteria for the reasons set forth in his report in the section titled "Findings and Conclusions."  Howe's testimony showed no data was ever provided substantiating proper engine performance, full load testing or normal oil samples.  Mr. Howe testified to excessive exhaust smoke and sheen observed during the sea trial and unexplained oil seepage from multiple cylinder head bolts.  Most importantly, Howe testified the vessel's 2009 starboard engine failure resulted from S & S's unworkmanlike rebuild of this engine in 2007.  The Court should give a set off of at least $97,117.98 towards any bond determined by this Court because of the failed starboard engine rebuild performed by the same contractor on the same vessel.

  32. The failure analysis concerning the 2009 starboard engine failure was confirmed by Matthew Schmahl's testimony and TSM's report admitted into evidence at the hearing.

  33. Just as this Court remarked at the hearing that it is not enough that Mr. Brismeur sit there and say: "then engines work" - the hard questions that were not answered still remain.  If the engines worked, then where are the oil samples that S & S allegedly took after the February 2011 sea trial?  Where was the MAN representative who allegedly wrote down the engine performance data at the 2011 sea trial?  Where was the full wide open throttle test?  Where were

any of the records Mr. Brismeur claimed to have but not have with him in Court at the evidentiary hearing regarding the propriety of the vessel's arrest or the sufficiency of the repairs to help the vessel perform her function as a recreational fishing vessel.

WHEREFORE, Claimant/Owner, Paul Fleisher, requests this Court to vacate the vessel's arrest; or, in the alternative, set a nominal bond amount of $1.00 so Fleisher can recover his vessel and have the engines repaired correctly and completely. In addition, Fleisher requests the Court award Fleisher his attorney's fees, damages and costs as provided for in the Local Rules and general maritime law along with other relief this Court deems proper.

DATED: May 12, 2011.

Respectfully submitted,

STROUP & MARTIN, P.A.
Attorneys for Defendants/Counter-Plaintiff
119 Southeast 12th Street
Fort Lauderdale, FL 33316
Telephone: (954) 462-8808
Facsimile: (954) 462-0278
E-mail:  jstroup@strouplaw.com


By:   */s/ James W. Stroup*
        JAMES W. STROUP
        Florida Bar No.: 0842117

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the foregoing has been electronically filed with this Court's EC/CMF docketing system, on this 12th day of May, 2011. We further certify that a copy of the foregoing document is being delivered this same date via CM/ECF to: William E. Stacey, Jr., Esq., William Stacey P.A., Attorney for Plaintiff/Counter-Defendant, P.O. Box 460053, Fort Lauderdale, Florida  33346.


By:   */s/ James W. Stroup*
        JAMES W. STROUP
        Florida Bar No.: 0842117