# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## IN ADMIRALTY

### Case No. 11-60020-CIV-ZLOCH/ROSENBAUM

S & S DIESEL MARINE SERVS., INC.,

      Plaintiff/Counter-Defendant,

v.

*M/V F-TROOP*, that certain 1991 53-foot
Viking motor vessel, bearing hull
identification number VKY53135B191, and
PAUL FLEISHER,

      Defendant/Counter-Claimant.

                                   /

## <u>ORDER</u>

      This case arises out of a dispute over work to the engines of Defendant Paul Fleisher's boat, the *M/V F-Troop*.  Defendant Fleisher contracted with Plaintiff S & S Diesel ("S & S") to rebuild the starboard and port engines of the *F-Troop*.  Essentially, S & S complains that it performed the necessary work, but Fleisher has refused to pay the outstanding balance, while Fleisher objects that S & S never completed the promised work, and the work that S & S did perform was deficient.  S & S sued the *F-Troop in rem* to foreclose on a maritime lien on the vessel, and it proceeded against Fleisher *in personam*, alleging breach of contract and *quantum meruit*.  In response, Fleisher filed his Counterclaim, setting forth claims for breach of contract and breach of implied warranty relating to S & S's work on the *F-Troop*'s engines.

      On February 11, 2011, the Honorable Cecilia M. Altonaga entered an Order directing the

issuance of a warrant for the arrest of the *F-Troop*.  *See* D.E. 9.  Following execution of the arrest

warrant on the *F-Troop*, Fleisher filed the pending Motion for Post-Arrest Show Cause Hearing

[D.E. 29], and the Honorable William J. Zloch referred the matter to me for disposition.[1]  *See* D.E.

30.

In his Motion, Fleisher requested that the Court set a hearing under Supplemental Admiralty

Rules E(f)(4) and E(5) and Local Admiralty Rule 3(g), S.D. Fla., and require S & S to show cause

why the Court should not vacate the arrest of the *M/V F-Troop*.   In the event that the Court

determined that the arrest should not be vacated, Fleisher also sought a bond hearing under

Supplemental Admiralty Rule E(5) at which the Court would establish the amount of security that

Fleisher must pay in order to release the *F-Troop* from arrest.

In accordance with Fleisher's Motion, on May 5, 2011, the Court held an evidentiary hearing

regarding the propriety of the arrest of the *F-Troop* and the appropriate amount of any security that

might be required should the Court sustain the arrest.   During that hearing, S & S presented the

testimony of Jean-Sebastien Brismeur, the president of S & S Diesel, and that of Sergio Rodriguez,

the diesel supervisor at S & S.  Fleisher called Brian Howe, an expert in diesel engines, and Matthew

Schmall, a marine surveyor.  In addition, the Court received into evidence exhibits from both parties.

As a result of issues that arose during the hearing, the Court provided the parties with the

---

[1]Prior to S & S's filing of the instant action, Fleisher had filed *Fleisher v. A 1990 53'
Viking Sport Fishing Vessel Named F-TROOP, USCG No. 1077134 in rem, and S & S Diesel
Marine Services, Inc., in personam*, Case No. 10-62530-CIV-ZLOCH/ROSENBAUM
("*Fleisher*").  *Fleisher* involves the same vessel at issue in the pending matter and seeks to have
S & S's lien declared invalid.  In addition, like Fleisher's Counterclaim in Case No. 11-60020,
*Fleisher* seeks damages for breach of contract and breach of warranty arising out of S & S's work
on the engines of the *F-Troop*.  On April 5, 2011, Judge Altonaga found the two cases "so
closely related" and accordingly transferred Case No. 11-60020 to Judge Zloch.

opportunity to submit supplemental briefing should they have desired to do so. The Court has now received and reviewed both parties' post-hearing filings [D.E. 44; D.E. 45; D.E. 48; D.E. 49]. Upon careful consideration of the evidence adduced at the May 5, 2011, hearing, as well as of the supplemental briefing and the entire record, the Court denies Fleisher's Motion to the extent that it seeks to vacate the arrest of the *F-Troop* and grants Fleisher's Motion as it requests the setting of a bond for the release of the *F-Troop*. For the reasons explained below, the Court sets the bond at $53,420.20. In addition, the Court establishes a counter-security requirement of $53,420.20. As expounded upon below, Plaintiff may choose whether it wishes to pay the counter-security or to offset it against the bond set for the release of the *F-Troop*.

### *I.  The May 5, 2011, Hearing*

During the May 5, 2011, hearing, Jean-Sebastien Brismeur, the president of S & S, testified that he formed S & S in 1999. D.E. 43 at 6. S & S performs engine rebuilds, fiberglass painting, carpentry, and other yacht-related work. *Id.* Prior to starting S & S, Brismeur worked as the head technician for another engine company for five years. *Id.* at 7. Brismeur attended an 18-month technical school on diesel engines and has worked his entire career in the marine field. *Id.*

According to Brismeur, he first met Fleisher in 2006. *Id.* In 2007 Fleisher came to S & S complaining of a major problem with his starboard engine on the *F-Troop*. *Id.* Thereafter, S & S and Fleisher entered into an agreement under which S & S conducted a complete rebuild of the engine. *Id.* at 8. Although the rebuild did not include a replacement of the water pump, S & S removed the pump, opened it up, inspected it, closed it, and reinstalled it on the vessel. *Id.* at 28-29.[2]

---

[2]Docket Entry 43 is a transcript of Brismeur's testimony. The docket sheet for the case does not reflect that the testimony of any other witness was transcribed. Therefore, although Matthew Schmahl provided additional testimony regarding S & S's 2007 actions with respect to

Matthew Schmahl, a marine surveyor with Travelers Insurance at that time, testified that Travelers accepted Fleiser's claim for the cost of the engine rebuild under his policy and paid for the rebuild on Fleiser's behalf.

In 2009, after approximately 111.8 running hours since the 2007 engine rebuild, the starboard engine suffered a catastrophic failure. Fleisher called Schmahl out to look at the engine. Among other things, Schmahl observed that the impeller wheel had suffered substantial destruction. Upon examination, Schmahl concluded that the closed coolant circulation pump had failed and caused the engine to overheat because the pump was missing a restriction fitting, which is a doughnut-shaped circular device that restricts the amount of coolant going through an otherwise-larger orifice. As Schmahl explained, the smaller the opening for the coolant, the higher the pressure, which propels the coolant forward to cool the system. When the pump lacks the restriction fitting, the pressure of the coolant proceeding through the system is significantly lower and lacks the forward-moving force that would attend it if the hole were smaller. As a result, the rate of flow to the exhaust manifolds may be inadequate and may cause the exhaust manifolds to overheat and crack, which, in turn, can cause destruction of the engine. Brismeur disagreed that the coolant pump failure had caused the destruction of the engine, opining instead that the engine had overheated and ultimately failed because someone ran the engine too hard when signs of overheating occurred. *Id*. at 28.

Schmahl testified that he talked with Brismeur about the water pump, and Brismeur explained that S & S removed the pump, took the cover off it, examined the pump and its bearings,

the pump, this Order cannot cite a docket entry showing that testimony. Instead, the Court relies upon its notes and recollection of the evidence presented at the May 5, 2011, hearing. Similarly, references in this Order to other testimony of Schmahl, Sergio Rodriguez, or Brian Howe bear no citations to the docket sheet because no transcript of their testimony appears to have been prepared.

and reinstalled the pump when he performed the engine rebuild in 2007.  Indeed, as Schmahl noted, a charge for a gasket on the 2007 rebuild further indicates that S & S removed the pump.  According to Schmahl, Brismeur stated during their conversation that all of the different types of pumps he works on look alike, but they do not all have restriction fittings.  Consequently, Schmahl testified, Brismeur conceded to Schmahl that it would be easy not to notice that a restriction fitting may have been missing on the pump on the *F-Troop* when the pump was closed up and reinstalled.

Plaintiff did not challenge Schmahl's testimony regarding his conversation with Brismeur about the restriction fitting on the *F-Troop*'s pump.  Moreover, Schmahl testified that he was not being paid for his involvement in the case.  Rather, Schmahl explained that he was testifying on behalf of Fleisher because he thought it was the right thing to do.  Based on the content of Schmahl's testimony, Schmahl's demeanor on the stand, and the lack of conflicting evidence, this Court finds Schmahl to be highly credible.

The *F-Troop* was subsequently brought to Diesel Services of America ("DSOA") for repair. DSOA engaged Brian Howe, a professional engineer and an expert in diesel engines, who inspected the engine and convinced Fleisher that it had to be removed to be overhauled.  Previously, Howe had worked in product support management for the diesel engine-maker MTU.  Specifically, he had dealt with complaints of engine failure and had performed failure analysis.  In addition, he had performed quality control inspections of engines.

Fleisher agreed to have the engine rebuilt, but problems ensued.  In January 2010, therefore, Fleisher had the *F-Troop* taken from DSOA to S & S to conduct the starboard engine rebuild.  *Id.* at 8-9, 30.  When the *F-Troop* arrived, according to Brismeur and Sergio Rodriguez, the diesel supervisor at S & S who worked on the *F-Troop* in 2010, the engine room was in disastrous shape.

*Id.* at 16-17.  Brismeur and Rodriguez described all of the pistons and cylinder heads as having been removed.  *Id.*  Rodriguez further explained that there was oil in the bilge, and parts of the engine later were found underneath the engine.  In fact, Rodriguez testified that he basically had a bucket of rusted parts of the engine that he had obtained from DSOA.  In addition, the engine block was off, the crankshaft was exposed, and everything open to the air had rusted.

Fleisher and S & S entered into a contract under which S & S was to rebuild the starboard engine.  *Id.* at 10.  A work estimate dated January 26, 2010, outlines the work to have been performed, itemizing the costs of parts and labor required for the starboard engine rebuild.  *See* Plaintiff's Exhibit ("PX") A.  The total estimate amounts to $97,117.98.  *Id.*  On April 2, 2010, Fleisher signed a service contract for the work detailed in the estimate.  *See id.*  The contract contained a provision entitled "Sea Trials," which contemplated the availability of a sea trial "for the purpose of testing and/or inspection of work and/or parts furnished by [S & S] . . . ."  *Id.*

Besides the starboard engine work, S & S provided a work estimate dated March 11, 2010, to Fleisher to rebuild the port engine for $46,422.05.  PX B; *see also* D.E. 43 at 10-11.  Although the port engine had not experienced a failure as the starboard engine had, at the time of the estimate, the port engine in the *F-Troop* was the original engine, it was approximately twenty years old, and it had about 3,000 running hours on it.  Consequently, Fleisher signed the service contract for the work outlined in the March 11, 2010, work estimate on April 2, 2010.  PX B.  In addition, S & S provided Fleisher with a work estimate dated April 28, 2010, for other repairs to the port engine, totaling $17,463.02.  *See* PX C; D.E. 43 at 13.  Although Fleisher did not sign this work estimate, Brismeur testified that Fleisher nonetheless authorized the repairs by e-mail.  D.E. 43 at 13.  All three of the contracts pertaining to the starboard and port engines provided payment terms of "50%

-6-

down, 50% on completion." *See* PX A, PX B, PX C. Also like the starboard engine contract, the two port engine contracts contained the "sea trial" provision.

According to Brismeur, S & S began work on the port engine at about the same time that it finished its rebuild job on the starboard engine, which Brismeur stated occurred at the end of March 2010. D.E. 43 at 30. In working on the port engine, S & S determined that the engine needed to be removed and machined. D.E. 43 at 14. S & S did not perform the machining work itself, but rather, sent it to a machine shop. *Id.* The machine shop that S & S usually used, however, could not look at the *F-Troop*'s port engine for a month. *Id.* Upon learning of the delay, Fleisher asked S & S to find another machine shop to do the work. *Id.*

At the alternative machine shop, the engine rebuild ran into significant problems. *Id.* Among other setbacks, the second machine shop ruined the crank shaft of the port engine by grinding it down too much. *Id.* at 14, 39. As a result, a new crank shaft had to be purchased. *See id.* at 39-40. S & S required Fleisher to pay for the crank shaft in order for S & S to continue working on the port engine. *Id.* Ultimately, however, S & S advised Fleisher that it would apply the cost of the new crank shaft to Fleisher's S & S bill because the crank shaft had been ruined through no fault of Fleisher's while S & S was in charge of the port engine's rebuild. *Id.* at 40-41. Because of the problems arising at the alternative machine shop, S & S eventually sent the port engine to the usual machine shop for machining. *Id.* at 14. This process resulted in additional delays to the port engine rebuild. *Id.*

Another factor contributing to the delay in the port engine rebuild included S & S's installation of the wrong forward nozzle jets on the engine. *Id.* at 14-15. S & S discovered that it had installed the incorrect parts when it started up the engine and the engine pressure fell below what

it should have been. *Id.* at 47-48.  After examining possible causes for the low engine pressure, S & S realized that it had put the wrong nozzle jets on the engine and remedied the deficiency. *Id.*

Besides these problems, S & S subsequently determined that the CAM shaft needed to be replaced. *Id.* at 52-53.  This caused an additional delay. *Id.*  Brismeur testified that as a result of all of the delays, the port engine was not ready for a sea trial until the end of September 2010. *Id.* at 13-14, 53-54. Yet while Brismeur claimed that the port engine was ready for a sea trial in September 2010, he conceded that even at this time, S & S still "had some odds and ends to put together before the sea trial . . . ." D.E. 43 at 54.  Explaining what he meant, Brismeur clarified, "Well, there is always little things that you do here and there. Whether it is clamps and hoses, you know, you just had two engines completely disassembled and you reassemble.  There is a lot of parts.  There is a lot of parts in the engine room.  So there is always things to do.  Even after a sea trial, there are little things that needs to be done." *Id.*

In addition to the rebuilds of the port and starboard engines, Brismeur stated that S & S performed a bottom job and other work on the boat. *Id.* at 18.  In support of this testimony, S & S presented to the Court invoices totaling $7,724.62 for such work. *Id.* at 18; PX D.

In all, as of September 30, 2010, S & S billed Fleisher $189,181.71 for the port and starboard engine rebuilds and the other miscellaneous work described above.  PX D; D.E. 43 at 18.  During the course of Fleisher's 2010 dealings with S & S, Fleisher paid S & S a total of $106,148.77, leaving a balance of $83,032.94. *See* PX D; *see also* D.E. 43 at 18-19.  But Fleisher declined to pay the balance of the bill until such time that S & S conducted a satisfactory sea trial of the rebuilt engines on the *F-Troop*.  As Brismeur explained, "The final step [of the engine rebuilding process] is to do a sea trial . . . ." D.E. 43 at 108.

-8-

Brismeur originally testified at the May 5 hearing, however, that S & S refused to perform a sea trial until Fleisher had paid the outstanding balance because that is "how it is done" in the marine industry.  D.E. 43 at 17, 56-57.  Brismeur also stated, however, that for engine rebuilds, he requires a 50% deposit, followed by an additional 30% at the time of engine start-up, and then he performs the sea trial, with the remaining 20% of the balance due after the sea trial.  *Id.* at 56-58. Later in the hearing, Brismeur clarified the apparent differences in his two statements, indicating that before the sea trial is performed, the customer pays either the remaining 50% or an additional 30% (with the remaining 20% after completion of the sea trial), "depending on the companies . . . ."  *Id.* at 108.  Howe agreed with Brismeur's statement of the custom and practice in the maritime industry as it regards sea trials of rebuilt engines, although Howe opined that based on the relationship history between S & S and Fleisher, it was reasonable for Fleisher to have expected a sea trial prior to paying the outstanding balance.

Despite the stand-off between the parties, they eventually agreed to have a sea trial. *See* DX 5.  Prior to the sea trial, however, on January 24, 2011, Howe inspected the *F-Troop* to determine whether it appeared to be ready for sea trial.  *See* DX 2.  Based on his examination of the vessel, Howe concluded that certain work needed to be performed in order for the sea trial to occur.  Among other such work, Howe opined that with respect to the port engine, the high exhaust temperature alarm senders were not connected, the heat exchanger coolant overflow hose was missing, the heat shield plate and overhead fire detection sensor were not connected, not all water hoses were properly clamped, and the pyrometer wiring was not secured.  *Id.*  As for the starboard engine, Howe expressed concern that a "very dangerous" situation existed in that the high-pressure fuel lines had been bent and were rubbing against each other, creating the "inevitab[ility]" of a hole in one or both

of such lines.  *Id.*  In addition, he complained that clamps on the high-pressure fuel lines had not

been secured with separation braces; both turbo chargers had oil leaks; not all of the water hoses

were properly clamped; the front pulley cover was loose and missing a bracket; the high-exhaust

temperature alarm senders, the forward temperature sensor, the outboard pressure sensor, bonding

and ground cables, the heat shield plate, and the overhead fire detection sensor had not been

connected; the heat exchanger coolant overflow hose was missing; and the pyrometer wiring was not

secured on either turbo charger outlet.  *Id.*

Brismeur disagreed that the water hoses were improperly clamped, explaining that anything

above the water line that is not on the engine does not require a double-clamp, and, in fact, does not

arrive from the factory with a double-clamp.  D.E. 43 at 56.  As for the rest of the deficiencies that

Howe concluded existed, Brismeur characterized them as "minor things that need[ed] to be done."

*Id.*

On February 1, 2011, the parties conducted the sea trial.  *See* D.E. 43 at 72; DX 5; DX 6.

Present on the *F-Troop* for the sea trial were Brismeur, Rodriguez, an S & S mechanic named

"Zack," Fleisher, Howe, Schmahl, and a representative of Scott Marine.  D.E. 43 at 72-74.  Scott

Marine was present at the request of Brismeur because Scott Marine is a Man diesel engine dealer,

and the engines on the *F-Troop* are Mans.  *Id.*  During the course of the sea trial, data was recorded

at S & S's direction.  *Id.* at 73.  That data consisted of readings relating to engine and oil

temperature, oil pressure, turbo boost, and other matters.  *See id.* at 73-74.

Although the sea trial began with everyone but Fleisher in the engine room, Brismeur asked

Howe and Schmahl to leave because the engine room is small and Brismeur believed that having so

many people in it was dangerous.  *Id.* at 74-75.  Additionally, Brismeur complained that Howe and

-10-

Schmahl were distracting Rodriguez from inspecting the engine by asking Rodriguez for information "every 5 seconds." *Id.* at 75.

As a result of their departure from the engine room, Howe and Schmahl were not able to obtain data readings on the engines' functioning other than from what appeared on the vessel's instruments at the helm. Howe explained that on a typical sea trial, he took a whole series of measurements in increments of 100 RPMs from idle to wide-open throttle, but he was unable to do that during the *F-Troop* sea trial because of his vantage point. Nevertheless, he indicated that he was not concerned because Brismeur and Howe had committed to sharing their data with each other when Howe was asked to leave the engine room.

Howe testified that during the sea trial, the wide-open throttle test spanned approximately 10 seconds as a result of the Scott Marine representative's decision. Brismeur disagreed, estimating that it lasted at least 30 seconds. D.E. 43 at 80-81. Brismeur further explained that "you don't run an engine full power when it is brand new. You break it in." *Id.* at 110. For his part, Howe opined that a wide-open throttle test should certainly last longer than 30 seconds and that no break-in period is necessary on modern engines such as those on the *F-Troop*. In addition, Howe continued, properly conducting a sea trial in 100-RPM increments has the same effect as breaking in an engine, anyway.

Howe also made other observations regarding the functioning of the engines during the sea trial. In this regard, he testified, for example, that the Scott Marine representative requested that the engines be reduced in throttle to allow for piston cooling in the midst of the sea trial, a circumstance that Howe thought significant because in his experience, cooling issues during a sea trial can suggest a problem with the engines. In addition, Howe opined that the engines emitted "excessive smoke and haze" at idle, further indicating engine problems. Besides these observations, Howe stated that

he saw more oil sheen at idle than should have been appropriate.

Following the sea trial, Howe reported observing several oil leaks and oil seepage on the engines, a circumstance that Howe characterized as a "major concern."  In response to questioning about the leaking oil, Rodriguez testified that when working on the *F-Troop*'s engines, he used oil on the threads and an anti-seizing compound under the shoulder of the heads when he installed them. Rodriguez could not recall whether the Man engine manual called for oil on the threads, although Rodriguez conceded that oil on the threads affects the torque, and if there were improper torque, the heads could emit coolant, compression, and oil.  In addition, noting that the turbo housing had been rebuilt by a sub-contractor, Rodriguez conceded that oil leaks around the turbo housing would indicate that the seals were most likely not in correctly.  He further explained that such a condition could also cause smoke in the exhaust.  And, while Rodriguez commented that oil leaks around the turbo housing should not affect the internals of the engine, he recognized that long-term, it would cause damage.

As for other deficiencies Howe identified in the engines during and after the sea trial, Howe complained that there was "an unusual selection of hardware in places."  More to the point, Howe recounted his observations that sometimes S & S used washers, and sometimes it did not.  In addition, Howe commented that fasteners were not "as they should have been."  Nor was the port engine painted.  Indeed, Howe testified that he would not have accepted the work in his quality-control capacity at his former position with DSOA.

After the sea trial and post-sea trial activities concluded, Howe and Schmahl sought to obtain

the data that S & S had collected during the sea trial. S & S, however, declined to provide the data.[3]

On February 7, 2011, at Fleisher's request, DSOA sent a technician to S & S to obtain oil samples from the *F-Troop*'s engines, but Brismeur told the technician that he "had no business being on the boat." *See* D.E. 43 at 94. Subsequently, however, Fleisher and the DSOA technician returned to the vessel and obtained the sample, apparently without Brismeur's permission. *See id.* Analysis of the samples revealed what Howe described as a high amount of lead in the port engine's oil, but not in the starboard engine's. Although Howe opined that the lead was indicative of bearing failure, he acknowledged that in order to ensure the validity of the findings, multiple samples were necessary.

Brismeur, on the other hand, first took issue with the collection of the oil sample, stating that the sample should have been drawn when the engines were warm. Howe disagreed, indicating that relevant considerations in taking an oil sample involved only avoiding sludge on the bottom of the oil container.

Next, Brismeur disputed that the oil analysis showed high lead levels, instead stating that the analysis reflected high zinc levels. *See* D.E. 43 at 96. He nevertheless conceded that the report prepared by the Motor Check Analysis Clinic, which tested the oil, specified, "Lead level (bearings) high." *Id.* at 97-98.

Brismeur further disagreed with Howe's conclusion that lead in the oil came from the bearings, testifying instead that the bearings do not have lead as a component and that the oil itself contains lead as an additive. *Id.* at 96. In response, Howe disagreed with Brismeur's testimony that

---

[3]During the course of the bond proceedings, S & S has indicated that it will be providing the data as a part of the litigation, but it does not appear to have done so yet.

bearings do not include lead.  And, while Howe acknowledged that some oils contain lead as an additive, he suggested that if the lead came from the oil, it should have been found in both engines, not just the port engine.

## *II.  Analysis*

### *A.  The Arrest Will Not Be Vacated*

"A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim, and it attaches the moment the debt arises." *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010) (internal quotation marks omitted).  Maritime liens differ from common-law liens in that a maritime lien is not merely a security device to be foreclosed upon by default but, rather, the maritime lien converts the vessel into the obligor and permits injured parties to proceed against it directly.  *Id*.  The arrest of a vessel *in rem* is effectuated to enforce a maritime lien in favor of the party suing the vessel and seeking the arrest.  *Industria Nacional Del Papel, CA v. M/V Albert F*, 730 F.2d 622, 625 (11th Cir. 1984) ("A court obtains *in rem* jurisdiction over a vessel when a maritime lien attaches to the vessel.").

Following the arrest of a vessel, the owner or other person claiming a right to the vessel may, pursuant to Supplemental Admiralty Rule E(4)(f), seek for the court to conduct a hearing and ultimately vacate the arrest.  In this regard, Supplemental Admiralty Rule E(4)(f) provides,

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

The purpose of the Rule E(4)(f) hearing is to "afford due process to a shipowner whose vessel has been arrested without the benefit of a post-arrest hearing."  *Linea Naviera De Cabotaje, C.A. v. Mar*

-14-

*Caribe De Navegacion, C.A.*, 1999 WL 33218589 at *2 (M.D. Fla. Nov. 17, 1999) (citing *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 910-12 (4ᵗʰ Cir. 1981)).

As the Supplemental Admiralty rules do not specify the form of the post-arrest hearing, the details of the proceeding are left to the Court's discretion. *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989). Nevertheless,

> [t]he post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond.

*Salazar*, 881 F.2d at 79; *20ᵗʰ Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1423, 1427 (M.D. Fla. 1997) (quoting *Salazar*, 881 F.2d at 79); *George v. A 2005 Donzi Motor Yacht, Hull Identification Number DNAFA008A505*, 2009 WL 3417707 at *1 (S.D. Fla. Oct. 22, 2009) (quoting *Salazar*, 881 F.2d at 79). Nor should the court conduct a mini-trial at this stage of the case. *See PDS Gaming Corp. v. M/V Ocean Jewell of St. Petersburg*, 2007 WL 2988798, *1 (11ᵗʰ Cir. Oct. 15, 2007).

During the Rule E(4)(f) hearing, the plaintiff must shoulder the burden of showing why the arrest should not be vacated. *Automarine, S.A. v. Asociacion Nacional de Agencias Distruidoras de Vehiculos, Inc.*, 2004 WL 5589735 at *1 (S.D. Fla. Aug. 5, 2004); *Linea Naviera De Cabotaje*, 1999 WL 33218589 at *2. Towards this end, the plaintiff must prove that the arrest or attachment was supported by "reasonable grounds." *George*, 2009 WL 3417707 at *1 (quoting *20ᵗʰ Century Fox Film Corp.*, 992 F. Supp. at 1427); *Linea Naviera De Cabotaje*, 1999 WL 33218589 at *2; *Danmar Lines, Ltd. v. Peticure, LLC*, 2009 WL 2135794 at * 2 (N.D. Tex. July 15, 2009). The plaintiff's burden is not onerous. *George*, 2009 WL at *1. Rather, the plaintiff must show only by a

preponderance of the evidence that it is entitled to a valid maritime lien.  *Id.*; *Seatrade Group N.V. v. 6,785.5 Metric Tons of* Cement, 2005 WL 3878026 at *2 (S.D. Tex. Dec. 7, 2005); *Vinmar Int'l Ltd. v. M/T Clipper Makishio*, 2009 WL 6567104 at *1 (S.D. Tex. Dec. 9, 2009).

Title 46, United States Code, Section 31342 governs the establishment of maritime liens and provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner – (1) has a maritime lien on the vessel . . . ."  The Eleventh Circuit has construed this provision to require a plaintiff claiming a maritime lien to prove that "(1) it provided 'necessaries' (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent."  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (citing *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987)).  The United States Code further defines the term "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway."  46 U.S.C. § 31301(4).  Taking into consideration the burden on a plaintiff seeking to uphold an *in rem* arrest based on a maritime lien, such a plaintiff must show by a preponderance of the evidence each of the elements set forth by the Eleventh Circuit in *Sweet Pea*.

In determining whether a plaintiff has satisfied its burden of showing entitlement to a valid maritime lien, a court may consider evidence at the post-arrest hearing that was not before it at the time of the original attachment in order to determine whether reasonable grounds existed for the arrest of the vessel.  *Linea Naviera De Cabotaje*, 1999 WL 33218589 at *2.  This circumstance stems from the fact that the court's role at the time of pre-judgment arrest involves quickly determining whether probable cause exists for the attachment.  *Id.* at *4.  At pre-judgment arrest, a plaintiff need only produce enough evidence to convince the court that reasonable grounds exist to

"stop the ship." *Id.* In contrast, at a post-attachment hearing, both parties can present additional evidence, including testimony and affidavits, allowing the court to review a more complete record in order to decide whether the arrest should continue or be vacated. *Id.* Accordingly, during the May 5, 2011, hearing, this Court had the ability to hear and consider evidence from both parties that was not previously presented to Judge Altonaga.

In this case Fleisher argues that S & S has failed to establish by a preponderance of the evidence that it is entitled to a maritime lien because (1) S & S has conceded that the engine rebuilds were not "100% complete" and payment terms did not require the last 50% of payment until "completion," *see* D.E. 45 at ¶ 13, and (2) S & S did not provide "necessaries" to the *F-Troop*. *Id.* at ¶ 14. Fleisher does not suggest specifically how his first objection factors into the Court's analysis of whether S & S has demonstrated by a preponderance of the evidence that "(1) it provided 'necessaries' (2) at a reasonable price (3) to the [*F-Troop*] (4) at the direction of [Fleisher]." *See Sweet Pea Marine, Ltd.*, 411 F.3d at 1249. And, although Brismeur conceded that "little things" remained to be done on the *F-Troop*'s engines, Fleisher has not argued that the engine rebuilds were not at least substantially completed. Moreover, even Fleisher's expert conceded that the usual custom and practice in the maritime industry requires payment before the sea trial, with any necessary adjustments and corrections being made after the sea trial. After review of Fleisher's argument and the case law, this Court concludes that the considerations raised by S & S's acknowledgment that the engine rebuilds were not "100% complete" are more properly addressed in determining the appropriate amount of any bond to be required for the release of the *F-Troop*, should S & S have satisfied its burden to demonstrate entitlement to a maritime lien.

With respect to Fleisher's second objection, Fleisher contends that S & S failed to supply the

*F-Troop* with "necessaries," asserting that "'necessaries' means goods or services that are **useful** to the vessel, keep her out of danger, **and enable her to perform her particular function**." D.E. 45 at ¶ 14 (emphasis in original) (citing *Equilease Corp. V. M/V Sampson*, 793 F.2d 598 (5th Cir.), *cert. denied*, 479 U.S. 984 (1986); *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio De Gastenata*, 1990 WL 172688, *5 (S.D. Fla. Mar. 28, 1990)). According to Fleisher, "S & S's failure to complete its work as required by the contracts, the failed sea-tr[ia]l and abnormal oil test result show the engines are not functioning to the manufacturer's specifications and most importantly do not enable *F-Troop* to perform her particular function as a recreational fishing vessel at this point in time until the engines are proven and the job is completed." *Id.* Thus, Fleisher contends, whatever else S & S may have done, it did not provide "necessaries" to the *F-Troop*, and, accordingly, is not entitled to a maritime lien.

The most significant problem with Fleisher's position stems from the fact that when S & S accepted the *F-Troop* for work in January 2010, its starboard engine was disassembled with its necessary parts contained elsewhere. Put simply, the starboard engine was entirely non-functional at that time; it could not have been used in that state as an engine even in a partially functional capacity. As of the February 1, 2011, sea trial, however, whatever else may have been wrong with the engines, they both worked well enough to allow a sea trial to be conducted.[4] That is not

---

[4]S & S objected at the hearing to the admissibility of any evidence relating to the sea trial, asserting that the sea trial was part of settlement negotiations. The Court construes S & S's objection as an invocation of Rule 408, Fed. R. Evid. Rule 408(a)(2) prohibits evidence of "conduct or statements made in compromise negotiations regarding the claim . . . ," when such evidence is offered "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction . . . ." The Court disagrees that factual evidence of how the *F-Troop* performed during the sea trial enjoys the protection of Rule 408. This rule deals with conduct and statements that suggest admission or acknowledgment of liability or the amount of liability. *See, e.g.*, Fed. R. Evid. 408,

something that could have occurred under any scenario with respect to the starboard engine's status in January 2010. Thus, the services that S & S provided to the *F-Troop* fit the statutory definition of "necessaries" in its most basic form: "repairs, supplies, . . . ."  46 U.S.C. § 31301(4).

As for the other elements of a maritime lien, Fleisher does not assert that S & S has failed to meet its burden. This Court agrees with Fleisher's implicit concession. Reviewing the remaining considerations out of turn, the third and fourth elements are satisfied because no question exists that the services that S & S provided were to the *F-Troop* at Fleisher's direction.

With regard to the final element — that of a "reasonable price" — even Howe testified that an engine rebuild would cost about $100,000.00. Since two engine rebuilds were involved in this case, therefore, a price not exceeding $200,000.00 would be reasonable. Here, S & S billed a total of $189,181.71, falling within the $200,000.00 range. Accordingly, this Court finds that S & S has satisfied its burden to establish each of the elements of a maritime lien by a preponderance of the evidence. As a result, the arrest should not be vacated.

---

1972 Proposed Rule Commentary (evidence of conduct and statements precluded by Rule 408 "is irrelevant, since the *offer* may be motivated by a desire for peace rather than from any concession of weakness of position") (emphasis added). The mere conducting of a sea trial and evidence regarding the results of that sea trial do not imply that either party has either conceded liability or the amount of any liability. To the contrary, although alternatively to S & S's objection to the admissibility of such evidence, S & S and Fleisher have both sought to rely on aspects of the sea trial results to prove their respective cases. *See, e.g.*, D.E. 43 at 76-77; D.E. 44 at 7. In fact, S & S invited the Court to rely upon S & S's contention that "the sea trial took place and . . . the engines ran under load for the duration" to conclude that a maritime lien exists. *See* D.E. 51 at ¶ 4. And, indeed, in finding the existence of a maritime lien on behalf of S & S, the Court has relied upon evidence acquired during the sea trial — that is, that the *F-Troop* engines ran following S & S's work on them. Therefore, even if Rule 408 or some other type of privilege might have otherwise precluded admissibility of the sea-trial evidence, S & S waived such protection; S & S cannot simultaneously employ the sea trial as a sword and a shield. Finally, the Court notes that nothing precludes parties from expressly agreeing prospectively that results of a test such as a sea trial will not be used in court. In this case, however, the Court received no evidence of such an agreement.

_B.  The Bond_

Having found that reasonable grounds exist for issuing the arrest warrant in this case, the Court now turns to Fleisher's alternative request for the Court to set a bond, thereby establishing the amount of security required to release the vessel from arrest.  Supplemental Admiralty Rule E(5)(a) provides for the release of an arrested vessel "on the giving of security, to be approved by the court or clerk."  Specifically, Rule E(5)(a) states,

> Whenever process of maritime attachment and garnishment or process in rem is issued the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by stipulation of the parties, conditioned to answer the judgment of the court or of any appellate court.  The parties may stipulate the amount and nature of such security.  In the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property due on appraisement, whichever is smaller.  The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 percent per annum.

Supplemental Admiralty Rule E(5)(a); _see also Salazar_, 881 F.2d at 77.  Thus, if the parties are unable to stipulate to the amount of a bond, as is the case here, the Court may set a bond in an amount "sufficient to cover the amount of plaintiff's claim fairly stated with accrued interest and costs . . . ."  _Id._

In determining the amount of a plaintiff's claim, the Court may look beyond the four corners of the claim.  _Barnett Bank, N.A. v. Cross State Towing Repair, Inc._, 1998 WL 1110389 at *1 (M.D. Fla. Oct. 29, 1998).  Indeed, "[w]here the claim is unliquidated and the parties cannot agree as to the amount of the bond, it will be incumbent upon the court to make some effort to place a reasonable

value on the claim." *20ᵗʰ Century Fox Film Corp. v. M.V. Ship Agencies, Inc.* 992 F. Supp. 1429,

1431 (M.D. Fla. 1997) (citations and internal quotation marks omitted).

Here, S & S seeks a bond of $110,847.36, consisting of the following components:

$83,032.94 for the outstanding balance for the work claimed to have been performed; $2,906.15 for

accrued interest on that amount since September 28, 2010; $2,500.00 for the cost of the arrest of the

*F-Troop*; $9,963.95 in interest on the $83,032.94 for two years; and $12,444.32 for storage fees that

S & S has paid for the *F-Troop* from September 28, 2010, through January 2011. *See* D.E. 44 at 9-

10. To justify the $83,032.94 figure, S & S refers the Court to *20ᵗʰ Century Fox Film Corp.*, 992 F.

Supp. at 1434, for the proposition that " . . . the amount of damages sought in the complaint should

be used as the basis for determining the amount of the bond or deposit unless the claim is blatantly

overstated." D.E. 44 at ¶ 42 (quoting *20ᵗʰ Century Fox Film Corp.* (quoting 7A Moore's Fed. Prac.

2d Ed. ¶ E.13[2] at E-612-613)) (internal quotation marks omitted). As the *20ᵗʰ Century Fox Film

Corp.* Court notes, however, this quotation from Moore's Federal Practice appears in the same

section of that treatise stating that any recovery against the *res* itself is limited to the amount of the

bond. Consequently, the *20ᵗʰ Century Fox Film Corp.* Court explained that it was influenced by that

consideration and found it "prudent to err on the high side." *Id.* at 1434.

Traditionally, "the rule as been that the admiralty court will not give a personal judgment

against the owner in excess of the amount of the release bond." *Industria Nacional del Papel, Ca.

v. M/V "ALBERT F*," 730 F.2d 622, 626 (11ᵗʰ Cir. 1984) (citation and internal quotation marks

omitted). As a result, courts have been understandably careful to err on the higher side when setting

a release bond.

As the Eleventh Circuit recognized more than twenty-five years ago, however, that rule has

"be[en] changing." *Id.*  Citing *The Fairisle*, 76 F. Supp. 27 (D. Md. 1947), *aff'd sub nom.,*
*Waterman S.S. Corp. v. Dean*, 171 F.2d 408 (4th Cir. 1948), the Eleventh Circuit noted that the
district court in that case had granted judgment for $45,000 after the ship had been released on a
$25,000 bond. *Industria Nacional del Papel, Ca.*, 730 F.2d at 626.  In approvingly describing the
justification for *The Fairisle* Court's conclusion, the Eleventh Circuit explained, "The district court
held that the award in excess of the bond was proper because the bond was not determined in relation
to the value of the vessel, and the parties had not agreed to the value of the bond." *Id.* (citation
omitted).

 This case presents precisely the same situation.  As evident from the hearing and this Order,
the parties have not agreed to the value of the bond.  And, rather than being based on the value of
the *F-Troop*, the amount of the bond that S & S seeks derives from the alleged outstanding balance
for the work S & S claims to have performed on the *F-Troop*'s engines.  Besides these two factors,
S & S has also sued Fleisher *in personam* under separate claims for breach of contract and *quantum
meruit*, which could, in their own rights, merit an award separate and apart from the claim to enforce
the maritime lien.  Moreover, significantly, Fleisher has submitted to the *in personam* jurisdiction
of the Court in his Counterclaim.  For all of these reasons, should S & S ultimately prevail in this
matter, its recovery should not be limited by any release bond set.  As a result, this Court sees no
reason to set a bond artificially high in order to avoid capping Plaintiff's possible ultimate recovery
in this case.

 In the absence of the concern for limiting a plaintiff's ultimate recovery, this Court sees no
reason for blindly accepting the contractual amount as the default amount of the bond, even if it is
not "blatantly overstated."  To the contrary, the language of Supplemental Admiralty Rule E(5)(a)

specifically obliges the Court to determine the "amount of the plaintiff's claim *fairly* stated . . . ." (emphasis added). Moreover, while an admiralty court is not a court of equity, it nonetheless "proceed[s] . . . upon equitable principles." *The Kalfarli*, 277 F. 391, 394 (2d Cir. 1921) (citations omitted).[5] Therefore, this Court will not rotely import the outstanding contractual balance as the basis for the bond in this case, as not doing so will not prejudice the plaintiff should it ultimately obtain an award in excess of the bond set.

For his part, Fleisher contends that the Court should impose a "nominal bond" of $1.00. *See* D.E. 45 at 7. In support of this position, Fleisher notes S & S's concession that the work for which the parties contracted is not "100% complete" and contends that the remaining balance on the contracts is not due until such time that the work is "100% complete." *Id.* at 7-8. Other factors that

---

[5]Fleisher takes issue with S & S's citation of *The Kalfarli* to support its contention that "even [if] Defendant showed that Plaintiff made fraudulent charges for work never performed, this would not defeat Plaintiff's maritime lien." *See* D.E. 48 at ¶¶ 4-5 (referring to D.E. 44 at ¶ 29). In *The Kalfarli*, the plaintiff, who had worked for a man named Olsen for many years and whom the *Kalfarli*'s master knew as Olsen's employee, solicited repair work on the *Kalfarli*. Believing incorrectly that the plaintiff was still working for Olsen, the *Kalfarli*'s master agreed to have the work performed, and, indeed, the work was done. When the master learned that the plaintiff did the work in his own capacity, however, the master argued that a fraud had been perpetrated on him and contended that he should not have to pay the bill. The Second Circuit concluded that the fact that the plaintiff had misled the master regarding for whom the plaintiff worked did not change the fact that work had been completed. Consequently, the court did not invalidate the maritime lien. Significantly, however, the court substantially reduced the amount of the lien because it concluded that the plaintiff had overcharged for the work he had performed and because he had sought to obtain payment for work that he did not actually do. In describing the reasons for its decision, the Second Circuit opined that awarding $1,700 of the $3,626 that the plaintiff sought, as well as denying interest and costs and imposing appellate costs on the plaintiff, amounted to "justice [being] done." *The Kalfarli*, 277 F. at 404. Thus, under *The Kalfarli*, where actual work is performed, the existence of the maritime lien should not be denied. Instead, any shortcomings or other deficiencies in the work should be considered in determining the appropriate amount of the lien and any subsequent recovery. In addition, *The Kalfarli* expressly recognized that equitable principles must guide an admiralty court's decisions and then specifically applied equitable principles in arriving at the court's decision. This Court finds both of these aspects of *The Kalfarli* to be consistent with modern-day admiralty law.

-23-

Fleisher submits that the Court should consider in its analysis include (1) testimony that S & S did not allow Howe and Schmahl in the engine room to record their own data during the sea trial, and S & S has not yet provided the data from the sea trial to Fleisher, Howe, Schmahl, or anyone else on Fleisher's behalf; (2) evidence that S & S did not permit Fleisher to review the results of an oil analysis it apparently obtained for the engines after the February 2011 sea trial; and (3) Fleisher's contention that S & S did not give a "reasonable explanation" for why the oil samples that Fleisher procured after the February 2011 sea trial reflected high levels of lead. *See* D.E. 45 at ¶ 30.

With respect to the third reason that Fleisher offers, this Court is not in a position to determine whether Brismeur's explanation for the allegedly high lead levels in the oil sample was "reasonable," based on the limited scope of the evidence presented at a bond hearing — even recognizing that such a determination would not be definitive for purposes of liability in this case. Ascertaining the reasons for the allegedly high lead levels in the oil sample would require significantly more detailed evidence that would exceed the scope of a bond hearing. Accordingly, this Court does not consider the allegedly high lead levels in making its bond decision.

As for Fleisher's other proffered reasons justifying a $1.00 bond, the Court finds them to be of significance to a certain extent. In this case, considering the parties' history, it does not seem excessive, at least at this preliminary stage of the inquiry, for Fleisher to have expected to obtain some reasonable level of assurance that the engines functioned as they should before paying off the remaining $83,032.94 of the $189,181.71 bill. More specifically, S & S's 2007 rebuild of the starboard engine had failed after only 111.8 running hours. Whether that occurred as a result of a S & S's error or Fleisher or his agent's running of the engine when it was showing signs of overheating, Fleisher was understandably concerned that the 2010 engine rebuilds should last longer.

In addition, during the course of rebuilding the engines, S & S reported to Fleisher repeated problems it encountered.  Among them, S & S revealed that the crank shaft had been improperly ground by its sub-contractor, thus requiring the purchase of a new crank shaft, and S & S itself had installed the incorrect nozzle jets on the engine, causing the engine pressure to be too low.  Other setbacks also arose.  Indeed, as a result of the numerous problems that plagued the port rebuild in particular, S & S took approximately eight months even to state that it had completed the rebuilds.  Moreover, during that period, Fleisher had paid S & S approximately $106,000 for the work.  Then S & S refused to conduct a sea trial unless Fleisher paid the outstanding balance, despite the fact that the contracts for the starboard and port engine rebuilds expressly allowed for sea trials "for the purpose of testing and/or inspection of work and/or parts furnished by [S & S] . . . ."  PX A, PX B, PX C.

Finally, when a sea trial was ultimately conducted, S & S asked Fleisher's representatives to leave the engine room, preventing them from collecting their own data, and since such time, while Fleisher's expert has opined that the rebuilds have deficiencies, S & S has declined to turn over data collected by its agents.  Under these circumstances, S & S has prevented Fleisher from being able to verify independently the efficacy of the rebuilds.  Regardless of S & S's reasons for doing so, the net result is that the Court cannot be confident that the engine rebuilds function entirely as they should.  This circumstance, of course, must bear on the Court's determination of the value of S & S's claim "fairly stated."  Yet, contrary to Fleisher's suggestion, it does not justify the entry of a $1.00 bond.

Instead, in accounting for these factors, the Court finds that the most equitable way to consider the sea trial for purposes of determining the fair valuation of S & S's claim requires the

Court to treat the sea trial as though it did not occur.[6]  Moreover, the Court concludes that for purposes of setting the bond only, a fair valuation of S & S's claim prior to the conducting of the sea trial should take into account the history of the parties.  In so doing, the Court finds especially instructive Brismeur's testimony regarding payment terms he accepts from some clients: 50% deposit, 30% prior to sea trial, 20% upon successful conclusion of the sea trial.  This testimony suggests an accepted methodology for placing a value on work performed up until the time of the sea trial.  Accordingly, the Court applies this formula to arrive at the value of S & S's claim "fairly stated," in order to determine the bond.  Applying these payment terms to the instant case yields the following results: the contract price totaled $189,181.71.  Eighty percent of $189,181.71 amounts to $151,345.37.  Fleisher has already paid $106,148.77.  Subtracting that amount from $151,345.37 leaves $45,196.60.

In addition, Brismeur testified that he incurred costs of $2,500.00 in paying for the arrest of the *F-Troop*.  D.E. 43 at 20.  These costs are properly included in the amount of the bond.  The Court does not reach the same conclusion, however, with respect to the dockage fees that S & S seeks.  Because the Court cannot find, at least at this preliminary point, that the claim fairly stated includes the final 20% of the balance, S & S would still be responsible for dockage costs under the contract while it completes the work.  Accordingly, it is not appropriate to include dockage costs in the bond.  Adding $2,500.00 to $45,196.60 equals $47,696.60.  Six percent interest per year amounts to

---

[6]Of course, the fair valuation consideration differs from the inquiry into whether S & S provided "necessaries" in the form of repairs that allowed a non-functioning engine to work in at least some capacity.  As the sea trial evidence regards the "necessaries" issue, the question involves a straight-forward "yes" or "no" determination: after arriving at S & S in a non-functional status, did the *F-Troop*'s engines as worked on by S & S allow the *F-Troop* to leave and return to land under the *F-Troop*'s engines' own power?  The answer is "yes," and Fleisher has not provided any evidence even to suggest otherwise.

$5,723.60 for a two-year period.  Adding the interest to the principal, the Court arrives at a bond amount of $53,420.20.

## C.  The Counter-Security

During the evidentiary hearing, the parties discussed the propriety of the Court's entry of a counter-security requirement.  Although Fleisher subsequently filed a Motion to Strike [D.E. 50] that indicated he was not yet seeking a counter-security, the Court has already expended resources reviewing evidence pertaining to the counter-security issue that was adduced at the hearing, and S & S has briefed the issue.  In addition, in view of the Court's determination regarding the bond, the Court anticipates that a motion for counter-security will be forthcoming from Fleisher.  Under these circumstances, in the interests of judicial economy, the Court considers the issue now.

Supplemental Admiralty Rule E(7)(a) governs counter-securities.  It states,

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.  Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise.

S & S correctly identifies *Afram Lines International, Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347 (11th Cir. 1990), as the controlling authority on the construction of Supplemental Admiralty Rule E(7)(a) in this circuit.  In *Afram*, the Eleventh Circuit provided the following guidance regarding counter-securities:

> Rule E(7)'s purpose is to "place the parties on an equality as regards security." . . . To effectuate this purpose, the district court retains broad discretion to determine whether (and in what amount) countersecurity shall be posted. . . .

-27-

> Although countersecurity determinations are vouchsafed to the district court's discretion, the court's inquiry must be guided by several considerations.  First, the court should be reluctant to order countersecurity if the plaintiff does not, by the posting of countersecurity, seek to release its property from the counterplaintiff's custody. . . .  Second, the court should determine whether the counterplaintiff could initially have brought its claim in rem or quasi in rem.  Where the counterplaintiff could not have proceeded in this manner, "there seems little justification for ever requiring a larger bond on the counterclaim than is required in the original action." . . .
>
> Additionally, the court should consider, if applicable, the plaintiff's financial ability to post countersecurity, . . . and the extent to which the counterclaim may be deemed frivolous. . . .

*Id.* at 349-50 (citations omitted).  Applying this framework to the facts in *Afram*, the Eleventh Circuit noted that the plaintiff in that case did not seek to release the property by posting the countersecurity and further, that the defendant could not have commenced its action against the plaintiff either *in rem* or *quasi in rem*.  The court then explained,

> We believe that where these two factors are present, district courts should not, absent extraordinary circumstances, require claimants like [the plaintiff] to post countersecurity in an amount which exceeds the security posted on the original claim. . . .  Thus, although [the defendant's] counterclaim cannot be deemed frivolous, and although [the plaintiff] could arguably have mustered some form of countersecurity,[] we nevertheless conclude, in light of the first two factors, that [the plaintiff] need not post countersecurity in excess of the amount posted by [the defendant].

*Id.* at 350.  In other words, although the *Afram* plaintiff did not wish to release the property and the defendant could not have proceeded against the plaintiff *in rem* or *quasi in rem*, the Eleventh Circuit still upheld the countersecurity requirement in an amount equal to the security posted by the plaintiff.

Following this rule, at least one court in this district has therefore imposed a countersecurity requirement under like circumstances.  In *Bradford Marine, Inc. v. M/Y JANI*, 2005 WL 5166203

-28-

(S.D. Fla. Mar. 11, 2005), Judge Marra held that where the plaintiff did not seek to release its property from the defendants' custody, the defendants proceeded against the plaintiff *in personam*, the defendants' claim was not frivolous, and the plaintiff had not demonstrated that it would be overly burdened by posting a countersecurity, the plaintiff "ha[d] not presented sufficient cause to be excused from the requirement of posting countersecurity."  *Id.* at *2.  Thus, Judge Marra concluded that the plaintiff was required to post a countersecurity "in order to 'place the parties on an equality as regards security.'" *Id.* (quoting *Afram*, 905 F.2d at 349).

The pending case is materially indistinguishable.  Although S & S does not seek to obtain possession of the *F-Troop* and Fleisher proceeds *in personam* against S & S in his Counterclaim, Fleisher's Counterclaim cannot fairly be characterized as "frivolous."  After being rebuilt by S & S in 2007, the *F-Troop*'s starboard engine failed following a mere 111.8 hours of running time. Examination of the coolant pump revealed highly destructed parts.  When Fleisher returned to S & S to have the starboard and port engines rebuilt in 2010, S & S kept the vessel for eight months before even claiming to be ready for a sea trial.  Moreover, during that period, S & S reported several problems with the rebuild of the port engine.  Then, when the sea trial did eventually occur, S & S denied Fleisher's agents access to the instruments providing data on the efficacy of the engines.  While this Court in no way opines that Fleisher will or will not be successful on his Counterclaim, in view of the evidence presented at the evidentiary hearing, one thing is certain: the Counterclaim bears no indicia of being frivolous.

Finally, although counsel for S & S asserted that posting a bond would interfere with S & S's ability to prosecute the case, no evidence was offered to demonstrate how requiring a countersecurity would obstruct S & S's ability to continue the case.  Furthermore, the evidence

adduced during the hearing showed that S & S has been in business for seven years and that it employs multiple individuals.  In addition, Brismeur testified to working on a wide variety of engines and equipment, suggesting that S & S enjoys significant success.  In view of all of these circumstances, the Court concludes that in order to place the parties on equal footing, a countersecurity requirement is necessary in this case.  As the amount of Fleisher's claim, if successful, exceeds the amount of the bond, in light of *Afram*, this Court sets the countersecurity in an amount equal to the bond: $53,420.20.

Finally, the Court notes that the bond is for the benefit of Plaintiff.  Consequently, should Plaintiff prefer to offset the bond with the amount of the countersecurity instead of paying the countersecurity, Plaintiff should have the opportunity to do so.  Either way, the parties will be on equal footing.  Accordingly, Plaintiff shall file a notice with the Court by **12:00 p.m. on Friday, May 20, 2011**, stating whether it wishes to satisfy the countersecurity by offsetting the bond or whether, instead, it desires to post the countersecurity separately.

**DONE AND ORDERED** this 18th day of May 2011.

ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

cc:   Hon. William J. Zloch
       Counsel of Record

-30-